701 So.2d 1186 (1997)
JUNO INDUSTRIES, INC., Appellant,
v.
William J. BIELAWSKI, III, et al., Appellees.
No. 97-220.
District Court of Appeal of Florida, Fifth District.
October 31, 1997.
Rehearing Denied December 9, 1997.
*1187 Judith J. Flanders and Donald G. Jacobsen of Lane, Trohn, Clarke, Bertrand, Vreeland, & Jacobsen, P.A., Lakeland, for Appellant Juno Industries, Inc.
Patricia M. Gibson of Maher, Gibson and Guiley, P.A., Orlando, for Appellee Hefner.
Matthew S. Mudano of Yerrid, Knopik & Mudano, P.A., and Donna S. Koch and Charles P. Schropp of Schropp, Buell & Elligett, P.A., Tampa for Appellee William J. Bielawski, III.
HARRIS, Judge.
This case presents an issue of first impression in Florida and, so far as we have been able to determine, rarely raised in other jurisdictions. It is different from West v. Caterpillar Tractor Company, Inc., 336 So.2d 80 (Fla.1976), which is the case in which Florida adopted the doctrine of strict liability. In West, discussing the obligation of a manufacturer's putting a defective product on the market, our supreme court explained:
In other words, strict liability should be imposed only when a product the manufacturer places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes *1188 injury to a human being. (Emphasis added).
The corollary of this statement is that if the product is sold with the expectation that the purchaser will test or inspect the product for the type of defect which causes the injury, then no manufacturer strict liability follows. This is consistent with Losee v. Clute, 51 N.Y. 494 (1873), which found no manufacturer liability on the following facts:
It appears by the case that the defendants Clute manufactured the boiler in question for the Saratoga Paper Company, in which they were stockholders, for the purposes and uses to which it was subsequently applied by it; and the testimony tended to show that it was constructed improperly and of poor iron; that said defendants knew at the time that it was to be used in the immediate vicinity of and adjacent to dwelling houses and stores in a village, so that in case of an explosion while in use, it would be likely to be destructive of human life and adjacent property, and that in consequence of the negligence of the said defendants in the improper construction of the boiler, the explosion that took place occurred and damaged the plaintiff's property. The evidence also tended to show that the boiler was tested by the company to its satisfaction, and then accepted, and was thereafter used by it for about three months prior to the explosion, and that after such test and acceptance the said defendants had nothing whatever to do with the boiler, and had no care or management of it at the time of the explosion, but that the company had the sole and exclusive ownership, management and control of it.
In MacPherson v. Buick Motor Company, 217 N.Y. 382, 111 N.E. 1050 (New York, 1916), Justice Cardozo explains why one who legitimately expects another to test the product to assure that it is free from defects avoids liability for subsequent injuries as follows:
If A leases to B a tumble-down house he is not liable, in the absence of fraud, to B's guests who enter it and are injured. This is because B is then under the duty to repair it, the lessor has the right to suppose that he will fulfill that duty, and if he omits to do so, his guests must look to him.
Although Losee (which has been criticized and would probably no longer be followed in negligence cases) and MacPherson are negligence cases, as opposed to strict liability cases, they nevertheless establish the proposition that if one accepts delivery of a product knowing the product has not been tested and assuming the obligation to test the product for defects, the manufacturer is not responsible, in the absence of fraud (as, for example, knowingly making the boiler out of inferior iron without advising the purchaser), for defects that the test should have revealed.
But the issue in our case does not relate to injuries occurring to third parties following the purchaser's testing and acceptance; it is whether the manufacturer of a product delivered to a purchaser to be tested by the purchaser is liable for injuries resulting during the testing process. The issue is thus distinguishable from Losee, MacPherson, and West. But is it a distinction without difference?
In our case the injury to the employees of the purchaser who undertook to conduct the tests occurred during the acceptance test. The test was not only contemplated by the parties at the time the product was delivered, but the contract specifications established the test procedures. The test, therefore, was not conducted because it was suspected that Juno's employees were negligent; the test was required in recognition of the fact that because of the nature of the product, welds might fail even if negligence is not present. And as a matter of law in this case, since the jury rejected the claim of negligence, Juno's employees were not negligent in the manufacturing process.
It is surprising that there is not more authority on this subject. One would expect that if the product is to fail, it will fail during its testing. But perhaps that is the reason why there are so few cases on this issue. If one appreciates that caution should be taken during the testing of an untested product in which a zone of danger might result if the *1189 product fails, then injury may be avoided because of the care taken. Apparently, but inexplicably, the purchaser in our case appears either to have not recognized the risk or to have ignored it.
In our case, Juno Industries, Inc. "manufactured" a 22-inch, 200 foot long pipe on the construction site by fusing together shorter segments of pipe by fusion welding. The purchaser of the product (and the construction company responsible for the over-all project), Frank Irey, Jr. Inc., accepted the responsibility for pressure testing the fused pipe before it was to be finally incorporated into the project. Even though a pipe manufactured to transport water is not an inherently dangerous product (the consequence of a failure is that water will leak from the pipe and perhaps cause erosion), if it is not conducted properly, testing the pipe may indeed be hazardous. Therefore, Juno supplied written specifications regarding the appropriate testing procedure. This procedure required that the pressure testing be accomplished by using water and warned of the dangers of testing with air. In contravention of the specifications, Irey pressure tested by compressing air into the pipe. Further, even though the specifications indicated that the test engineer should consider backfilling before testing in order to prevent movement of the pipe (even if water were used to test the welds), Irey not only tested the pipe in an unfilled trench but also had his employees stand beside the pipe during testing so they could listen for air leaks. The worst thing that could happen, of course, happened. A weld failed and the pipe, thrashing around, killed one employee and injured another.
The jury below found Juno 5% liable based solely on the theory of strict liability. The issue before us is whether the court erred in not directing a verdict in Juno's favor at the conclusion of all the evidence. We find error and reverse.
Courts justify the imposition of strict liability on the basis that the purchaser (consumer) is entitled to expect that if the manufacturer puts a product in the stream of commerce that it has adequately tested or inspected (or properly labeled) the product to assure that it is safe for human use. Therefore, if a product defect causes an injury, the manufacturer should be liable regardless of manufacturer negligence. But this justification fails if the purchaser not only knows that the product is untested but also assumes the obligation to test to see if a potential defect, a defect that both parties know may well be present, actually exists. This is simply not a strict liability case.
If an injury occurs during the purchaser's test of a product, a test conducted in accordance with his purchase agreement, then manufacturer's liability, if any, should be based on general negligence principles. Since the jury returned a verdict of no negligence, manufacturer's liability is foreclosed in this case.
Under the facts of this case, it is understandable why the jury found no negligence. Here, the parties knew that the welds had a potential to fail. Otherwise there would be no need for pressure testing. And because the parties recognized that if the welds failed the testing itself could be hazardous, specific testing procedures were included in the contract documents. The testing method set out in the contract was for hydrostatic (pressure by water) testing. Had this procedure been followed, there is no indication that the injuries would have resulted. Concerning air testing, the testing procedure specifically emphasized the following:
The testing methods described in this section are specific for water-pressure testing. These procedures should not be applied for air-pressure testing because of the serious safety hazards involved.
Appellees seek to avoid the consequence of Irey's failure to comply with the testing specifications because of a conversation between Irey, the president of Frank Irey, Jr., Inc., and an agent of Juno in which Irey stated that he desired to air test the system instead of using water. Juno's agent was said to have represented that the system could be tested by air as well as by water since one hundred PSI, whether water or air, would not hurt the pipe. But it was not represented that Juno's agent either recommended, authorized or approved an air-testing *1190 procedure for testing the pipe. Nor does the record suggest why Juno would have the authority or obligation to do so. Juno had delivered the pipe into the exclusive control of the purchaser for the conduct of the test and retained no authority over the product or the site. Further, since the record does not reflect that Irey revealed its proposed airtest procedure, Juno would have been unable to evaluate it. Anyone who has seen the erratic movement of a balloon as it expels air should have been aware that the pipe might well shift dramatically if a weld failed and pressurized air were permitted to escape. But even this danger could have been minimized, and still permitted air-testing, by erecting a strong chain-link fence between the pipe and the observers. The jury properly determined that Juno should not be liable in negligence for injuries caused by an unsafe testing procedure substituted by Irey and neither approved by Juno nor authorized by the specifications. The defect in the weld simply was not the proximate cause of the injuries. The parties recognized that such failure might occur and agreed that a pressure test should be conducted. Had the pressure test been conducted in a safe manner, the weld failure would have caused no injury. It was, therefore, the negligence of Irey in ignoring the warnings contained in the specifications relating to air-testing and in conducting the test of the pipe in an inherently dangerous manner that was the proximate cause of appellee's injuries. And manufacturer strict liability should not be imposed merely because an injury results from the use of a product and the plaintiff is unable to prove negligence.
In any event, since we find that this is not a case in which it is proper to impose strict liability, we find that the court erred in not directing a verdict in favor of Juno on that issue.
REVERSED.
W. SHARP and ANTOON, JJ., concur.